DA 13-0210

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 300

DALTON PAIGE GOURNEAU, deceased, by
and through his personal representative
ROXANNE GOURNEAU, and ROXANNE
GOURNEAU, individually,

        Plaintiffs and Appellants,

    v.

HENRY H. HAMILL, in his individual
capacity and in his official capacity as a
District Superintendent, THE WOLF POINT
SCHOOL BOARD/THE BOARD OF TRUSTEES,
and THE STATE OF MONTANA,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Fifteenth Judicial District,
                In and For the County of Roosevelt, Cause No. DV-11-31
                Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Solomon S. Neuhardt; Neuhardt Law Firm, P.C.; Billings, Montana

        For Appellees:

                Harlan B. Krogh; Crist, Krogh & Nord, LLC; Billings, Montana

                              Submitted on Briefs:  August 7, 2013
                                      Decided:  October 15, 2013

Filed:

            _____
                            Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Roxanne Gourneau (Gourneau), acting individually and on behalf of her deceased son, Dalton Paige Gourneau (Dalton), appeals a judgment entered by the Fifteenth Judicial District Court, Roosevelt County, granting summary judgment to the Wolf Point School Board (Wolf Point). The sole issue on appeal is whether Wolf Point is entitled to judgment as a matter of law on Gourneau's negligence claims. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2 During his senior year at Wolf Point High School in Wolf Point, Montana, seventeen-year-old Dalton committed suicide in his home. Earlier that fall, Dalton had successfully tried out for the Wolf Point varsity wrestling team. Then, on November 23, 2010, a school counselor observed Dalton "putting a can of chew in his pocket." Students at Wolf Point High School are prohibited from possessing tobacco at the school.

¶3 Dalton was familiar with Wolf Point's disciplinary procedures. Dalton's previous three years at Wolf Point High were characterized by recurrent disciplinary problems, including frequent absences, physical altercations, theft, insubordination, and verbal harassment. Wolf Point disciplined Dalton for these infractions with a variety of warnings and suspensions.

¶4 The Wolf Point High School Parent/Student Handbook provides the school's policies and procedures for regulating student conduct, including disciplinary provisions. A violation of the prohibition against the "use or possession of drugs and/or

paraphernalia, alcohol, or tobacco" constitutes a "level 3 offense," which at a minimum results in a suspension.

¶5     The Wolf Point Wolves Activities handbook provides disciplinary actions for violations of the Athletic Department Training Rules.  The Athletic Department's rules prohibit the purchase, use and possession of tobacco, and also prohibit the possession of "devices specifically or reasonably associated with alcohol or tobacco or drug use."  The first violation of the tobacco policy results in a sixty-day suspension from all extracurricular activities, including wrestling.  Gourneau does not claim that Dalton was unaware of Wolf Point's disciplinary policies.

¶6     Several Wolf Point staff, including Joseph Paine (Wolf Point's Principal), Henry Hamill (Superintendent), and Mike Erickson (the Athletic Director), met with Dalton and notified him that he would be suspended from wrestling because of his possession of the tobacco can.  Paine advised Dalton that even if Hamill would not overturn the 60-day suspension, Dalton could still appeal the suspension to the Wolf Point School Board. Dalton became distraught when he realized his suspension from wrestling could prevent him from participating in the State tournament that year.  Dalton left the school and went home.  Later that afternoon, Dalton committed suicide while alone in his home.

¶7     Gourneau, acting individually and on behalf of her deceased son, filed a complaint in 2011 against Wolf Point, the State of Montana, and Henry Hamill, in his individual

3

capacity and in his official capacity as a District Superintendent.[1]  Gourneau alleged that Dalton's death was the direct and proximate result of Wolf Point's negligence. Gourneau's complaint also alleged other counts related to her negligence claim, including "respondeat superior," negligent hiring of Henry Hamill, negligent supervision, negligent training, wrongful death and survivorship claims, and negligent infliction of emotional distress.  The District Court granted summary judgment to Wolf Point on February 27, 2013.  This appeal followed.

## STANDARD OF REVIEW

¶8     We review de novo an appeal from a district court's summary judgment ruling. *Poole v. Poole*, 2000 MT 117, ¶ 13, 299 Mont. 435, 1 P.3d 936.  We apply the same standard as the district court: summary judgment should be granted when the pleadings, discovery, and affidavits show "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." M. R. Civ. P. 56.  The party seeking summary judgment initially must demonstrate that no genuine issues of material fact exist. *Poole*, ¶ 13.  When the moving party has met its burden, the non-moving party must "submit evidence of sufficient facts to support a genuine issue of material fact to preclude summary judgment in favor of the movant." *Meadow Lake Ests. Homeowners Ass'n v. Shoemaker*, 2008 MT 41, ¶ 38, 341 Mont. 345, 178 P.3d 81.  If we determine that genuine issues of fact do not exist, we must then determine whether the moving party is entitled to judgment as a matter of law. *Poole*, ¶ 13.

---

[1] Gourneau did not pursue the claims against the State of Montana and did not appeal the summary judgment order in favor of Hamill.

¶9 Negligence actions ordinarily involve questions of fact. *Poole*, ¶ 14. But if the moving party establishes that any one element of negligence lacks a genuine issue of material fact, and the non-moving party fails to come forward with proof that a genuine issue exists, summary judgment is proper. *Poole*, ¶ 14 (quoting *Wiley v. City of Glendive*, 272 Mont. 213, 216, 900 P.2d 310, 312 (1995)).

## DISCUSSION

¶10 Negligence requires a legal duty, breach of that duty, causation, and damages. *Krieg v. Massey*, 239 Mont. 469, 472, 781 P.2d 277, 278-79 (1989) (citing W. L. Prosser & W. P. Keeton, *Prosser and Keeton on Torts* § 30, 164-65 (5th ed. 1984)). Whether a legal duty is owed is a question of law. *Poole*, ¶ 19. The District Court held that Wolf Point did not have a duty to prevent Dalton's suicide in light of the facts presented by the parties' submissions. Material facts are identified by looking at the substantive law governing a claim. *McGinnis v. Hand*, 1999 MT 9, ¶ 6, 293 Mont. 72, 972 P.2d 1126.

¶11 Gourneau argues that disputed material facts defeat Wolf Point's attempt to establish the absence of a special relationship with Dalton, under which it could be held to a duty to prevent Dalton's suicide. Gourneau argues that fact questions remain regarding whether Dalton actually possessed tobacco, whether Wolf Point generally disciplined its students consistently, whether Wolf Point disciplined Dalton consistently, and whether Wolf Point had knowledge of Dalton's state of mind.

¶12 Whether a party owes a legal duty depends largely on whether the allegedly negligent act was foreseeable. *Poole,* ¶ 20. "As it relates to the existence of a legal duty,

5

foreseeability is 'measured on a scale of reasonableness dependent upon the foreseeability of the risk involved with the conduct alleged to be negligent.'" *Poole*, ¶ 20 (quoting *Lopez v. Great Falls Pre-Release Serv.*, Inc., 1999 MT 199, ¶ 27, 295 Mont. 416, 986 P.2d 1081). In other words, duty "is measured by the scope of the risk which negligent conduct foreseeably entails." *Busta v. Columbus Hosp. Corp.*, 276 Mont. 342, 363, 916 P.2d 122, 134 (1996). The question is whether the defendants reasonably could have foreseen that their conduct could have resulted in injuries to the plaintiff, though "the specific injury need not be foreseeable." *Hinkle ex rel. Hinkle v. Shepherd Sch. Dist. # 37*, 2004 MT 175, ¶¶ 28-30, 322 Mont. 80, 93 P.3d 1239. Without foreseeability of any danger of direct injury or any risk from an intervening cause, no duty exists; "in the absence of duty, there is no negligence." *Poole*, ¶ 20.

¶13 Generally, a party cannot recover in negligence for the suicide of another "since the act or suicide is considered a deliberate intervening act exonerating the defendant from legal responsibility . . . ." *Krieg*, 239 Mont. at 471, 781 P.2d at 278. Under some circumstances, a duty to prevent a suicide may exist "when someone is obligated to exercise custodial care over the eventual decedent, is in a position to know about the latter['s] suicidal potential, and is lax with respect to taking preventive measures." *Krieg*, 239 Mont. at 471, 781 P.2d at 278. We noted in *Krieg* that "[t]hese situations typically involve hospitals or prisons." *Krieg*, 239 Mont. at 473, 781 P.2d at 279.

¶14 Even in a custodial context, we have held that a duty does not arise unless the custodian knows or should know of the suicidal tendencies of a prisoner. *Pretty On Top*

6

*v. Hardin*, 182 Mont. 311, 317, 597 P.2d 58, 61-62 (1979). For example, in *Pretty On Top*, after a prisoner committed suicide, the prisoner's wife claimed that the prison had a duty to prevent the suicide. *Pretty On Top*, 182 Mont. at 314, 597 P.2d at 60. This Court affirmed the District Court's grant of summary judgment for the prison because the suicide was not foreseeable where the prisoner "did not have a history of mental disease or emotional disturbances, nor had he attempted suicide previously." *Pretty On Top*, 182 Mont. at 314, 318, 597 P.2d at 60, 62. This Court held that "the District Court was required to follow the general rule that suicide is an intentional act and grant defendant's motion for summary judgment." *Pretty On Top*, 182 Mont. at 318, 597 P.2d at 62.

¶15 We held in *Kreig* that this general rule applies "even more forcefully" where no custodial or special relationship exists. *Krieg*, 239 Mont. at 472, 781 P.2d at 279. In *Krieg*, this Court affirmed summary judgment for a landlord when a tenant committed suicide because no duty could be established absent a custodial or special relationship. We also agreed with the District Court's conclusion that no genuine issues of material fact existed regarding foreseeability because the plaintiff failed to present any evidence that the tenant's suicidal tendencies were communicated to the landlord. *Krieg*, 239 Mont. at 473, 781 P.2d at 279.

¶16 We also upheld summary judgment for a defendant for an unforeseeable suicide in a Federal Employers' Liability Act (FELA) case. In *Marazzato v. Burlington N. R.R. Co.*, an employee of Burlington Northern Railroad Company committed suicide after being placed in an "Alternative Work Location," known as a "rubber room" among

7

employees. *Marazzato v. Burlington N. R.R. Co.*, 249 Mont. 487, 489, 817 P.2d 672, 673 (1991). The plaintiff presented expert testimony to show that the confinement of an employee to an isolated room where there was no work to be done created a reasonable possibility of harm. *Marazzato*, 249 Mont. at 490-91, 817 P.2d at 674-75. The plaintiff did not present evidence, however, that the railroad knew or should have known that the unsupervised rubber room could have resulted in foreseeable harm to him. We concluded that when a plaintiff fails to provide any proof that a defendant knew or should have known that its conduct created a reasonable possibility of harm, summary judgment is appropriate. *Marazzato*, 249 Mont. at 492, 817 P.2d at 675.

¶17     In the present case, we agree with the District Court that Wolf Point owed no legal duty because Dalton's suicide was unforeseeable by Wolf Point. In support of its motion for summary judgment, Wolf Point introduced evidence of Dalton's well-documented history of disciplinary problems—including instances where Dalton was subjected to arguably more severe punishments than his wrestling suspension. While Dalton attended Wolf Point High, various teachers formally filled out discipline referral forms for his behavior over thirty times. For these offenses, Dalton was disciplined with numerous detentions, parent-teacher conferences, in-school suspensions, and out-of-school suspensions. No evidence suggests that Dalton ever harmed himself, exhibited dangerous behaviors, or threatened suicide, even when subjected to these repeated reprimands. As the non-moving party, Gourneau had the burden of proving by "competent evidence," rather than denial or speculation, that a genuine issue of material fact existed. *Bridgman*

8

*v. Union Pac. R.R. Co.*, 2013 MT 289, ¶ 20, ___ Mont. ___, ___P.3d___.  Gourneau did not introduce any evidence indicating that any representative of the school, including Hamill, knew that Dalton presented a potential risk of suicide.  Gourneau's complaint acknowledged that Dalton "had no history of mental health problems or treatment."

¶18 In light of the facts in the record, Gourneau's claim of a special relationship is not supported by the law.  Dalton was not subjected to any restraint on his personal liberty that triggered a custodial or special relationship.  *See Morrow v. Balaski*, 719 F.3d 160, 170 (3d Cir. 2013) (noting that "every other Circuit Court of Appeals that has considered this issue in a precedential opinion has rejected the argument that a special relationship generally exists between public schools and their students."); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 973 (9th Cir. 2011) ("[c]ompulsory school attendance is insufficient to invoke the special-relationship exception").  A "special relationship arising between a particular school and particular students under certain unique and narrow circumstances . . . must be so significant as to forge a different kind of relationship between a student and a school than that which is inherent in the discretion afforded school administrators as part of the school's traditional *in loco parentis* authority or compulsory attendance laws."  *Morrow*, 719 F.3d at 171.  Wolf Point did not exercise custodial care over Dalton akin to the care of a hospital or a prison.  Dalton was not in custody: as the District Court stated in its order granting summary judgment, Dalton's suicide occurred in his own home "approximately two hours after school had ended that day."  Gourneau did not present

9

evidence sufficient to show the existence of a special relationship that would support a duty to prevent the suicide.

¶19 Not one of Gourneau's alleged factual disputes otherwise raises a genuine issue as to foreseeability. The first three of Gourneau's alleged factual issues—whether Dalton actually possessed tobacco, whether Wolf Point disciplined students consistently, and whether Wolf Point disciplined Dalton consistently—have no bearing on whether Dalton's suicide was foreseeable by Wolf Point. Gourneau admitted that Dalton "acknowledged to school personnel that he had possessed chewing tobacco on November 23, 2010." Even if Gourneau had introduced evidence showing that Dalton's can of chewing tobacco was empty or that Wolf Point inconsistently disciplined its students, those facts alone still could not prove that Wolf Point reasonably could have foreseen Dalton's suicide. Gourneau's other asserted issues of fact—for example, whether Dalton fully understood Wolf Point's disciplinary policies or whether news on student suicides was readily available from local media sources—fail for the same reason. School authorities frequently are called upon to impose sanctions against students violating school policies. Absent evidence demonstrating foreseeability, they cannot be held to a legal duty to predict or prevent in every instance a student's tragic decision to take his life.

¶20 The sole remaining fact issue, whether Wolf Point had knowledge of Dalton's state of mind, could—at least in theory—impact the imposition of a duty by affecting foreseeability. The record, however, lacks evidence supporting Gourneau's assertion.

10

Gourneau points to a response to the following request for admission: "Admit that Dalton Paige Gourneau never threatened to commit suicide." Gourneau responded, "Plaintiff cannot either admit or deny this Request. It is believed that Dalton told school aide Carol Wallette on November 23, 2010[,] that he should go home and hang himself." There was no affidavit or deposition testimony from Wallette or any other person with actual knowledge of any statements Dalton may have made to any school employee or official. While we view the facts in a light most favorable to the party seeking to preclude summary judgment, we will not imagine facts to be in the record when they are not.

¶21 It is well settled that a district court may consider only admissible evidence in reviewing a motion for summary judgment. *N. Cheyenne Tribe v. Roman Catholic Church*, 2013 MT 24, ¶ 21, 368 Mont. 330, 296 P.3d 450; M. R. Civ. P. 56(e)(2); *see also Hiebert v. Cascade Co.*, 2002 MT 233, ¶¶ 30-32, 311 Mont. 471, 56 P.3d 848 (affidavits properly stricken when made without personal knowledge and based upon hearsay evidence). Without an affidavit or other competent evidence to support her claim, Gourneau's assertion is conclusory and "do[es] not raise a genuine issue of material fact." *Abraham v. Nelson*, 2002 MT 94, ¶ 26, 309 Mont. 366, 46 P.3d 628.

¶22 The only evidence that is in the record concerning Dalton's state of mind is that he was feeling "pretty low" after talking with school administrators. Dalton's low emotions are certainly understandable. But suspension from athletic activities following a student's violation of school policy is an ordinary incident of school administration endemic in the relationship between a school and its students. In the absence of facts that

11

could show the school was on notice of any suicidal tendencies, the record does not substantiate Gourneau's speculation that Wolf Point reasonably should have known Dalton's state of mind or that its conduct created a reasonable possibility of harm. We conclude that no genuine issues of material fact exist in this case and that Wolf Point is entitled to judgment as a matter of law.

## CONCLUSION

¶23 The judgment of the District Court is affirmed.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON